JUDGE SWAIN

Howard Kleinhendler
Julian D. Schreibman
Sara Spiegelman
WACHTEL & MASYR, LLP
1 Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
(212) 909-9500



RECEIVED
JAN 25 2011
U.S.D.C. S.D.N.Y.
COMPLETED

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALLAN H. APPLESTEIN, as Trustee for the Benefit of D.C.A. GRANTOR TRUST, GEORGE R. MARKS, GEORGE R. MARKS, as Beneficiary for the Benefit of GEORGE R. MARKS I.R.A., HAROLD SCHWARTZ, as Trustee for the Benefit of HAROLD SCHWARTZ 1997 IRREVOCABLE TRUST, HAROLD SCHWARTZ, as Trustee for the Benefit of HAROLD SCHWARTZ 1998 LIVING TRUST, HAROLD SCHWARTZ as Beneficiary for the Benefit of HAROLD SCHWARTZ I.R.A., ROSENMAN FAMILY, LLC, ROBERT I. LAPPIN, as Trustee for the Benefit of SHETLAND PROPERTIES EMPLOYEE SAVINGS & RETIREMENT PLAN, and DANIEL SILNA, as Trustee for the Benefit of O.D.D. INVESTMENTS L.P. PROFIT SHARING PLAN, | Civil Action No. _____ |
| | |
| | **COMPLAINT** |
| | |
| | **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| THE UNITED STATES OF AMERICA and JOHN DOES 1-10, | |
| Defendants. | |

## TABLE OF CONTENTS

NATURE OF THE ACTION ...................................................................................................4

THE PARTIES .....................................................................................................................8

JURISDICTION AND VENUE ...............................................................................................10

FACTUAL ALLEGATIONS ...................................................................................................11

    A.   Background - Bernard Madoff's "Business" ...............................................................11

    B.   June 1992- Avellino & Bienes and the SEC's First Missed Opportunity.................12

          1.  Background and Red Flags...........................................................................12

          2.  The SEC's Negligent Handling of its Investigation.........................................12

          3.  Closing of the Investigation & Conclusions....................................................15

    C.   May 2000- Harry Markopolos' First Attempt .............................................................16

    D.   March 2001-Markopolos Tries Again .......................................................................17

    E.   May 2001- News Articles Raise Suspicion that Madoff is a Fraud ...........................18

    F.   May 2003-A Hedge fund manager files a Complaint
         Identifying "Indicia of a Ponzi Scheme" ..................................................................20

          1.  Background and Red Flags...........................................................................20

          2.  The SEC's Negligent Handling of its Investigation.........................................21

          3.  Closing of the Investigation..........................................................................26

          4.  The SEC's Negligent Handling of its Next Investigation .................................29

    G.   December 2006 - Taking Madoff at His (Lawyer's) Word.........................................38

    H.   June 2007 - Markopolos' Final Warning...................................................................39

      I.    March 2008 - A Note to the Chairman .......................................................................... 39

      J.    December 2008 - The House of Cards Collapses ........................................................ 40

CLAIM FOR RELIEF .................................................................................................................... 43

Plaintiffs, by their undersigned attorneys, for their Complaint against the Defendant, the

United States of America, allege the following based upon the investigation conducted by

Plaintiffs' counsel, which included, among other things, review of an interview with Bernard

Madoff; reviews of interviews with other individuals with knowledge of the events alleged

herein; a review of public documents, including the Report of the Office of the Inspector General

of the SEC and its forensic experts, dated August 31, 2009, court filings by the United States

Securities and Exchange Commission, the Trustee Irving Picard, and others; news reports; and

other publicly available materials. Plaintiffs believe that substantial evidentiary support exists for

the allegations set forth herein. All of the allegations herein are based upon information and

belief after an extensive investigation except as to those allegations regarding Plaintiffs, which

are made upon knowledge:

## NATURE OF THE ACTION

1.     This complaint seeks money damages suffered by Plaintiffs arising from the

negligence and gross negligence of the United States Securities and Exchange Commission

("SEC")[1] in performing its non-discretionary functions during its multiple investigations and

examinations of Bernard Madoff ("Madoff") and his firm, Bernard L. Madoff Investment

Securities LLC ("BMIS"), triggered primarily by its receipt of numerous detailed, credible

complaints between 1992 and 2008.  As the Office of the Inspector General of the SEC (the

"OIG") and its forensic experts have determined in its report, dated August 31, 2009 (the

---

[1] The SEC has primary responsibility for enforcing the federal securities laws and regulating the securities industry, the nation's stock and options exchanges, and other electronic securities markets. Its mission "is to protect investors, maintain fair, orderly, and efficient markets, and facilitate capital formation." (http://www.sec.gov/aboutlwhatwedo.shtml, accessed October 13, 2009)

4

"Report"),[2] the SEC had countless opportunities to stop the Ponzi scheme Madoff operated over

sixteen years, and botched all of them.[3]

      2.      Through its negligent actions, inactions and lack of diligence, the SEC caused

Madoff's scheme to continue, perpetuate, and expand, eventually resulting in billions in losses by

investors, and directly caused Plaintiffs to suffer monetary losses. The SEC owed a duty of care

to all of those investors, including Plaintiffs. The SEC breached its duty of care and, in doing so,

proximately caused Plaintiffs' injuries, in that those injuries were the natural, probable, and

foreseeable outcome of the SEC's failure to terminate Madoff's Ponzi scheme despite its multiple

opportunities to do so. The fact that Madoff's own actions also contributed to Plaintiffs' injuries

does not protect the SEC from liability, because the SEC's negligence was both a substantial

factor in bringing about those injuries, and because those injuries would not have occurred but

for the SEC's negligence. Had the SEC carried out its functions with reasonable due care,

plaintiffs would not have suffered monetary losses.

---

[2] The SEC's Office of the Inspector General "is an independent office within the U.S. Securities and Exchange Commission (SEC or Commission) that conducts audits of programs and operations of the Commission and investigations into allegations of misconduct by staff or contractors. The mission of the OIG is to detect fraud, waste and abuse, and to promote integrity, economy, efficiency and effectiveness, in the Commission's programs and operations." (see http://www.sec -oig.gov/, accessed October 13, 2009).

[3] The factual allegations contained herein are based principally on the findings of the Report, which relied on the OIG's extensive review of documents and sworn testimony obtained from numerous current and former SEC employees, email and document searches, document requests to third parties, and a team of experts and consultants with "unique and specialized experience." (Report pp. 5-6) To the extent that the allegations made herein are not expressly set forth in the Report, they are based on reasonable inferences drawn therefrom, or upon plaintiffs' information and belief. To the extent that factual allegations or determinations made in the report are not expressly restated herein, they are hereby fully incorporated by reference.

3.      The SEC's negligent actions are not shielded by the doctrine of sovereign immunity because those actions did not occur in the performance of its discretionary functions. Those members of the SEC staff who investigated Madoff from time to time were not crafting policy or making rules.[4] Rather, the SEC staff was carrying out their usual and regular obligations to examine and investigate its registrants and potential wrongdoing within the context of defined policies and routine common-sense practices, and failed to fulfill their duties.

4.      Beginning in 1992, and continuing through 2008, the SEC received at least eight complaints or submissions indicating that Madoff was operating a Ponzi scheme. In response, the SEC commenced four formal investigations or examinations, as well informal reviews or inquiries. But, throughout the course of those many inquiries, the SEC staff consistently disregarded SEC policy that "all relevant information contained in tips and complaints must be sufficiently vetted" and that, even if the staff is skeptical, they "must still review all of the allegations before any conclusions can be made with regard to the legitimacy of such allegations." (Report p. 167, n. 104)

5.      The SEC's negligence, incompetence, inexperience, inattentiveness, and laziness, caused Madoff and BMIS to pass through the SEC's investigations without being discovered as a Ponzi scheme. Indeed, over many years, although the SEC was presented with innumerable smoking guns unveiling Madoff's wrongdoing, the SEC staff failed to follow up and failed to

---

[4] Throughout this complaint, for the sake of simplicity, "policies" refer to any formal or informal policies, rules, standards, guidelines, procedures, codes, routines or other directives implemented by the SEC to govern the conduct of its agents. "Practices" refers to common-sense standards of conduct required of SEC agents in the course of exercising their duties with reasonable due care, regardless of whether the SEC had promulgated any formal or informal policies with respect to that conduct.

recognize any of them for what they were - - the keys to unraveling possibly the largest financial fraud in history.

6.     The SEC's negligence took many forms over the course of its multiple investigations of Madoff. Inquiries were delegated from SEC teams that had expertise in financial fraud to ones that did not. Critical tasks were assigned to junior staffers who had no relevant training or experience. Those junior staffers were at best functionally unsupervised, and at worst, were given supervision that actively discouraged them from pursuing leads. Policies and practices regarding case opening and closing memoranda, investigation planning memoranda, and communications between SEC offices and teams were disregarded. Investigative teams consistently failed to contact third parties to confirm Madoff's claimed trading activities, even when called for by the teams' own plans for their investigations. Petty jealousies and inter-office rivalries led to tipsters being disregarded and key resources of other SEC teams going unutilized. And clouding every step of the SEC's various investigations was a perception of Madoff's power and influence that cowed staff members into giving him the benefit of the doubt, despite their suspicions that, or even knowledge that, he had lied to them.

7.     For at least sixteen years, the SEC's failure to follow proper investigative procedures and practices, or even to observe simple common sense, allowed Madoff to perpetuate his scheme, drawing in innumerable new victims who were totally unaware that the government agency sworn to protect them had fallen down on the job.

8.     The SEC must be held accountable and responsible for its own negligent actions and inactions that directly and proximately caused the loss of billions of investor funds. The SEC investigated Madoff on multiple occasions over sixteen years and had innumerable chances to expose the fraud. The SEC failed to do so because the assigned staff committed numerous

negligent, non-discretionary acts and inactions due chiefly to their inexperience, incompetence, bureaucratic pettiness, laziness, inattentiveness, and an agency culture of deference to powerful industry figures. Rather than protect the investing public by uncovering and disclosing that Madoff was perpetuating a fraudulent scheme, the SEC's ineptitude directly resulted in Madoff using, to the detriment of his many victims, the multiple implied "clean bills of health" issued by the SEC to Madoff to market his scheme to unsuspecting victims, vastly expanding his fraudulent web.

9. Plaintiffs here were among those victimized by Madoff. Plaintiffs made their investments in reliance on Madoff's reputation, clean regulatory record, and the SEC's implied stamp of approval.

10. The SEC did not have "discretion" to conduct its investigations with the lack of reasonable due care revealed in the Report, which evidenced such outrageous, wanton indifference to public safety as to constitute gross negligence. The misconduct of the SEC staff had nothing to due with rule-making or policy analysis and implementation.

## THE PARTIES

11. Plaintiff ALLAN H. APPLESTEIN, is the managing trustee of D.C.A. GRANTOR TRUST ("DCA"), a Florida Trust, with a principal place of business in Aventura, Florida. Applestein also resides in Aventura, Florida. As of December 11, 2008, when Madoff's fraud became known to plaintiff, DCA had more than $500,000 invested with BMIS.

12. Plaintiff GEORGE R. MARKS is an individual residing in Nassau County, New York. As of December 11, 2008, when Madoff's fraud became known to plaintiff, Marks had more than $500,000 invested with BMIS.

8

13.     Plaintiff GEORGE R. MARKS is the Beneficiary of and acting for the Benefit of GEORGE R. MARKS I.R.A. ("Marks IRA"), an Investment Retirement Account located in Colorado. As of December 11, 2008, when Madoff's fraud became known to plaintiff, the Marks IRA had more than $500,000 invested with BMIS.

14.     Plaintiff HAROLD SCHWARTZ is the Trustee of HAROLD SCHWARTZ 1997 IRREVOCABLE TRUST, a trust based in New York County, New York. As of December 11, 2008, when Madoff's fraud became known to plaintiff, it had more than $500,000 invested with BMIS. Mr. Schwartz resides in New York County.

15.     Plaintiff HAROLD SCHWARTZ is the Trustee of HAROLD SCHWARTZ 1998 LIVING TRUST, a trust based in New York County, New York. As of December 11, 2008, when Madoff's fraud became known to plaintiff, it had more than $500,000 invested with BMIS.

16.     Plaintiff HAROLD SCHWARTZ is the Beneficiary of and acting for the Benefit of HAROLD SCHWARTZ I.R.A. ("Schwartz IRA"), an Investment Retirement Account based in Colorado. As of December 11, 2008, when Madoff's fraud became known to plaintiff, the Schwartz IRA had more than $500,000 invested with BMIS.

17.     Plaintiff ROSENMAN FAMILY, LLC ("Rosenman") is a New York limited liability company with a principal place of business in Nassau County, New York. As of December 11, 2008, when Madoff's fraud became known to plaintiff, Rosenman had more than $500,000 invested with BMIS.

18.     Plaintiff ROBERT I. LAPPIN is the Trustee of SHETLAND PROPERTIES EMPLOYEE SAVINGS & RETIREMENT PLAN based in Salem, Massachusetts. Mr. Lappin resides in Salem Massachusetts. As of December 11, 2008, when Madoff's fraud became known to plaintiff, it had more than $500,000 invested with BMIS.

19.     Plaintiff DANIEL SILNA is the Trustee for the Benefit of O.D.D. INVESTMENTS L.P. PROFIT SHARING PLAN based in Carlstadt, New Jersey. As of December 11, 2008, when Madoff's fraud became known to plaintiff, it had more than $500,000 invested with BMIS. Mr. Silna resides in New Jersey.

20.     Defendant United States of America is the federal government constituted by the Constitution of the United States, and is the proper party defendant under the Federal Tort Claims Act in this action for damages resulting from the negligence of the United States Securities and Exchange Commission and its agents and employees.

21.     Defendants JOHN DOES 1-10, are individuals whose identities are presently unknown, but who, acting in their official capacities on behalf of the SEC, committed the tortious conduct set forth below.

## JURISDICTION AND VENUE

22.     This action arises under the Federal Tort Claims Act, 28 U.S.C. §§ 2671, et seq. ("FTCA").

23.     Each of the plaintiffs has submitted an administrative claim to the SEC for damages relating to their investment in BMIS. Six months have gone by since the submission of each of these claims with no response by the SEC, other than a denial letter to DCA dated September 17, 2010. Accordingly, all conditions precedent under the FTCA have been met.

24.     This court has jurisdiction under, and by virtue of, 28 U.S.C. §§ 1331 and 1346 (b).

25.     Venue is founded in this judicial district based on 28 U.S.C. §§ 1391(e)(2) and 1402(b), as a substantial part of the acts or omissions complained of occurred in this district, and

on 28 U.S.C. §§ 1391(e)(3) and 1402(b) as some of the named individual plaintiffs reside in this district.

## FACTUAL ALLEGATIONS

### A. Background -- Bernard Madoff's "Business"

26.     In 1960 Bernard Madoff founded Bernard L. Madoff Investment Securities LLC, a brokerage firm, through which he rapidly accumulated thousands of clients. In 1990, 1991, and 1993, Madoff served as the Chairman of the NASDAQ Stock Market, and the trust and authority he had developed in that position enabled him to attract a wide array of investors to his firm in subsequent years. These investors included individuals, charities, universities, and pension funds, who often entrusted their entire life savings or endowments to Madoff.

27.     Investors received account statements showing consistent gains, and redemptions were paid to investors without delay.

28.     Some lucky investors chose to liquidate their accounts after accumulating what appeared to be a substantial profit. But many chose to maintain, or even increase, their investments, given the prospect of continuing gains--a prospect that also enticed innumerable additional investors to entrust their money to Madoff. New victims, enticed by stories of Madoff's success, were induced to invest in the scheme, thereby allowing Madoff to keep it afloat by using the new victims' money to pay redemptions by the old investors.

29.     Madoff operated his business in a highly secretive and centralized fashion, shrouded from public scrutiny. In fact, Madoff operated the investment advisory component of the business (which was allegedly the profit-making center of the operation) from a separate floor of the firm's offices in Manhattan's Lipstick Building located at 885 Third Avenue, with access restricted to Madoff and a small handful of his most trusted confederates. Only Madoff

11

had access to the books and records supposedly accounting for those assets and for the billions of dollars in trades he claimed to be executing.

### B. June 1992 -- Avellino & Bienes and the SEC's First Missed Opportunity

#### 1.   Background & Red Flags

30.     In June 1992, customers of a firm known as Avellino & Bienes provided the SEC with promotional materials created by Avellino & Bienes that touted "100%" safe investments that would return consistently high rates of return over significant periods of time.  The opportunity to invest with Avellino & Bienes was portrayed as "special" and exclusive, and the firm claimed that VIP clients would earn even higher returns. (Report pp. 41-42).

31.     The Enforcement team of the SEC's New York office opened an investigation, and the red flags that had prompted the investigation soon multiplied.  The team quickly learned that Madoff had complete control over all of Avellino & Bienes' investments.  He made all investment decisions with no input from Avellino or Bienes, who merely funneled investor money to Madoff.  One of the firm's principals told the SEC that Madoff had not lost money on a single trade executed for a firm customer since their exclusive relationship began in 1962.  The principal explained that Madoff was able to achieve these results by using a strategy based on blue-chip stocks hedged by options on the S&P index. (Report pp. 45-46).

#### 2.   The SEC's Negligent Handling of its Investigation

32.     The Enforcement team suspected, based on the red flags raised before and during its initial investigation, that Avellino & Bienes was operating a Ponzi scheme, but never considered the possibility that Madoff was also running a Ponzi scheme.  The team's investigation was tailored and carried out accordingly, resulting in the first of many missed opportunities to catch Madoff. (Report p. 46, n. 20; 49).

33.     The team the SEC assigned to investigate Avellino & Bienes was woefully inexperienced. Both examiners assigned to the case were only 2 years out of college, and had no expertise or understanding of how Ponzi schemes operated. (Report pp. 46-47). Moreover, the supervisor later admitted that the team may have been intimidated by Madoff, stating that "it was fair to say that because of ... Madoff's reputation at that time ... there may not have been any thought to look into [his] operation any further." (Report p. 50).

34.     The team conducted a very limited examination, failing to take rudimentary steps that would have demonstrated that Avellino & Bienes was merely one of many fronts for Madoff's Ponzi scheme.

35.     For example, the team made no effort to obtain bank records or otherwise trace the source of the money that was used to repay Avellino & Bienes' investors. This was critical because if Avellino & Bienes were operating a Ponzi scheme as suspected, it should not have had access to cash to payoff investors. The team's supervisor later told OIG that the team "should have been aware" of this fact, and one of the staffers testified that it would have been "common sense" to trace the money. (Report p. 49).

36.     Critically, the team did not make any effort to obtain any other information independently from third parties, which an SEC branch chief would later tell OIG was "the only way to verify" whether a Ponzi scheme is being conducted. (Report p. 290, n. 202). Although the team did review records from the Depository Trust Corporation ("DTC"),[5] they obtained

---

[5] The DTC is the entity which holds actual paper stock certificates on behalf of their true owners, and maintains and operates the records and mechanisms for buyers and sellers to transfer ownership without having to take custody of or actually exchange the physical certificates. DTC's records can easily be used to verify claims of ownership of securities.

those DTC records from Madoff, not directly from DTC, and the records Madoff supplied were later determined to have been falsified.

37.     Moreover, with respect to document requests to Madoff, "[n]one of the [team members] interviewed by the OIG recalled whether the SEC eventually received the information and documents concerning Bernard Madoff that it requested in discovery." (Report p. 58). The documents the team did receive only raised more doubts. For example, the team's auditors were unable to confirm Madoff's trading activity using his customer statements, which the auditors found indecipherable.

38.     A senior-level SEC examiner later told OIG, "clearly if someone ... has a Ponzi [scheme] and, they're stealing money, they're not going to hesitate to lie or create records." (Report p. 49). The lead staffer on the team later admitted to the OIG that the team "should have been aware that the money used to pay back Avellino & Bienes' customers could have come from Madoff," and that independent confirmation of the source from DTC was essential. (Report p. 49). The supervisor stated that the DTC confirmation was "missed and should have been followed up on." Another team member characterized the failure to look into the actual source of the funds as a failure to observe "common sense." (Report p. 60).

39.     Separately, while the lead staffer believed that the entire Avellino & Bienes operation raised red flags and was "suspicious," the team took no actions to investigate Madoff's alleged investment strategy, which was the sole vehicle for Avellino & Bienes' investments. They never attempted to determine whether the strategy could actually achieve the returns Madoff claimed, or to substantiate the extraordinary claim that he had never suffered a trading loss in three decades. (Report p. 60).

### 3. **Closing of the Investigation & Conclusions**

40.     Instead of taking the simple steps required by SEC policy and common-sense practice, the SEC took the easy way out. It brought an action against Avellino & Bienes for selling unregistered securities, and required it to refund all of its customers' money. However, the team made no effort to determine where Avellino & Bienes was getting the funds to payout a full redemption to all of its customers, reflecting a basic lack of understanding of Ponzi schemes. In fact, the money was coming from Madoff, who could only have been relieved to evade discovery of his entire scheme by paying redemptions to a single fund's customers.

41.     The SEC's negligence in the Avellino & Bienes investigation included, without limitation: (a) Assignment of a Ponzi-scheme investigation to SEC staff who had no experience with Ponzi schemes; (b) Failure by the staff who received the initial complaint to tell the investigating staff that a Ponzi scheme was suspected; (c) Failure to obtain DTC statements from DTC itself, instead of requesting them from Madoff; (d) Failure to inquire as to the source of the money used to pay back Avellino & Bienes customers, and; (e) Failure to inquire further when Avellino & Bienes were unable to produce any detailed financial statement or records.

42.     As the OIG's Report concluded: "The result [of the SEC's investigation of Avellino & Bienes] was a missed opportunity to uncover Madoff's Ponzi scheme 16 years before Madoff confessed. The SEC had sufficient information to inquire further and investigate Madoff for a Ponzi scheme back in 1992. There was evidence of incredibly consistent returns over a significant period of time without any losses, purportedly achieved by Madoff using a basic trading strategy of buying Fortune 500 stocks and hedging against the S&P index. Yet, the SEC seemed satisfied with closing Avellino & Bienes down, and never even considered investigating Madoff, despite knowing that Avellino & Bienes invested all of their clients' money exclusively

with Madoff. The SEC's lead examiner said Madoff's reputation as a broker-dealer may have influenced the inexperienced team not to inquire into Madoff's operations." (Report, pp. 26-27).

### C. May 2000 - Harry Markopolos' First Attempt

43.    In May 2000, eight years after the SEC's first chance to stop Madoff slipped away during the Avellino & Bienes investigation, an industry analyst and Certified Fraud Examiner named Harry Markopolos gave the SEC's Boston office an eight-page complaint questioning the legitimacy of Madoff's reported returns, and provided substantial evidence and analysis to support his complaint. (Report p. 61).

44.    Markopolos set forth two possibilities for Madoff's performance: (a) that "[t]he returns are real, but they are coming from some process other than the one being advertised, in which case an investigation is in order;" or (b) "[t]he entire fund is nothing more than a Ponzi Scheme." Markopolos contended that Madoff's returns were unachievable using the "split-strike conversion" strategy and pointed out that Madoff's "perfect market-timing ability" was not a realistic explanation. Markopolos also pointed out that Madoff did not allow outside performance audits, further indicating a real risk of fraud. (Report p. 61).

45.    Markopolos subsequently attended a meeting at the SEC's Boston office in which he explained his analysis and encouraged the SEC to investigate Madoff. However, it was clear to Markopolos and an SEC accountant in attendance that the top SEC staffer at the meeting had "zero comprehension" of what Markopolos was explaining. In fact, Markopolos characterized the staffer as "not having a basic understanding of finance." The Report would later conclude that the staffer's ignorance of the subject matter was the likely reason that Markopolos' 2000 warning was disregarded by the SEC. (Report p. 64).

16

46.     This same staffer later stated that he had forwarded the complaint to the New York office, which he claimed was the proper office to handle the complaint because of Madoff's location in New York. However, the OIG found no evidence that he had actually forwarded the complaint, and nobody in the New York office recalls receiving it. (Report pp. 64- 65).

### D. March 2001 -- Markopolos Tries Again

47.     In March 2001, ten months after filing his first complaint, Markopolos returned with a second complaint, with updated information and additional analysis aimed at simplifying the presentation to the SEC staffers. The new complaint included an analysis of Madoff's returns versus the S&P 500, showing that: "[Madoff purportedly] [e]arned over 15% a year for over seven years with extremely low standard deviation of 4.3% versus the S&P 500 which earned over 19.5% but with 12.9% annual standard deviation over the same period. This program earned 80% of the market's return with only one third of the risk. Think about it! Is this really possible, or is it too good to be true? Only 3 down months vs. the market's down 26 months during the same period, with a worst down month of only -1.44% (April 1993) vs. the market's worst down month of -14.58% (August 1998) .... These numbers really are too good to be true. And every time I've thought a company's or a manager's numbers were "too good to be true," there has been fraud involved." (Report pp. 67-68).

48.     Markopolos concluded that Madoff's "numbers really are too good to be true." Markopolos' analysis was supported by the experience of two of his colleagues, Neil Chelo and Frank Casey, both of whom had substantial experience and knowledge of investment funds, and both of whom offered their corroboration to the SEC. (Report pp 68-70).[6]

---

[6] Chelo was a chartered financial analyst, chartered investment analyst, and a financial risk manager with substantial experience researching hedge funds. Casey was a registered investment adviser with an options specialization. (Report p. 68).

49.     This time, the SEC's Boston office did refer Markopolos' second complaint to New York, but the New York office decided, after just one day, not to investigate the complaint. The senior Enforcement attorney in New York who received Markopolos' second complaint rejected it out of hand, sending an email stating, "I don't think we should pursue this matter further." Later, the Enforcement attorney told the OIG that she "would have needed to consult" someone more experienced to actually understand Markopolos' complaint, but did not do so. (Report p. 73). The OIG "could find no explanation for why Markopolos' complaint, which the Enforcement attorney ... acknowledged was 'more detailed than the average complaint,' was disregarded so quickly." (Report p. 27).

**E. May 2001 - News Articles Raise Suspicion that Madoff is a Fraud**

50.     In May 2001, the respected industry publications MARHedge and Barron's both published articles questioning Madoff's operations and returns.

51.     The MARHedge article, written by Michael Ocrant and entitled, "Madoff tops charts; skeptics ask how," stated how many were "baffled by the way [Madoff's] firm has obtained such consistent, nonvolatile returns month after month and year after year," describing the fact that Madoff "reported losses of no more than 55 basis points in just four of the past 139 consecutive months, while generating highly consistent gross returns of slightly more than 1.5% a month and net annual returns roughly in the range of 15.0%." (Report pp. 80 -81).

52.     The MARHedge article further discussed how industry professionals: "marvel at [Madoff's] seemingly astonishing ability to time the market and move to cash in the underlying securities before market conditions turn negative and the related ability to buy and sell the underlying stocks without noticeably affecting the market. In addition, experts ask why no one has been able to duplicate similar returns using [Madoff's] strategy." (Report p. 81).

53.     The Barron's article, written by Erin Arvedlund and entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks his investors to keep mum," discussed how Madoff's operation was among the three largest hedge funds, and has "produced compound average annual returns of 15% for more than a decade" with the largest fund "never [having] had a down year." The Barron's article further questioned whether Madoff's trading strategy could achieve those remarkably consistent returns and asked why Madoff was not charging fees for his advisory business: "Curiously, he charges no fees for his money-management services. Nor does he take a cut of the 1.5% fees marketers like Fairfield Greenwich charge investors each year. Why not? "We're perfectly happy to just earn commissions on the trades," he says. Perhaps so. But consider the sheer scope of the money Madoff would appear to be leaving on the table. A typical hedge fund charges 1% of assets annually, plus 20% of profits. On a $6 billion fund generating 15% annual returns, which adds up to $240 million a year. The lessons of Long-Term Capital Management's collapse are that investors need, or should want, transparency in their money manager's investment strategy. But Madoff's investors rave about his performance - - even though they don't understand how he does it." (Report pp. 75-76).

54.     The Barron's article was not merely information in the public domain that the SEC should have known about - there is clear evidence that the SEC was aware of the article at the time of its publication in May 2001. Indeed, on May 7, 2001, a senior staffer in the SEC's Boston office followed up with the New York office regarding the 2001 complaint from Markopolos that Boston had forwarded to New York. The staffer asked the top staffer on the New York Broker- Dealer team if he wanted a copy of the article, so that the New York team could follow up on the Markopolos complaint in light of the corroborating information in the

19

article. The staffer declined, and OIG found no evidence that anyone in the New York office reviewed the article prior to 2005. (Report pp. 76-77).

55.     Separately, the top staffer in the SEC's Washington office's Investment Management team reviewed the Barron's article when it came out, and wrote a note at the top of the article that the author is "very good" and that: "This is a great exam for us!" But the staffer did not send the article to anyone else in her office, or any other, and no investigation was ever opened. Nobody else in the Washington office recalled seeing the Barron's article until years later. 10 (Report p. 86).

### F.  May 2003 -- A Hedge Fund Manager Files a Complaint Identifying "Indicia of a Ponzi Scheme"

#### 1. Background & Red Flags

56.     In May 2003, the SEC's Washington Investment Management team received a detailed complaint against Madoff from a reputable hedge fund manager based on information he had compiled in the course of performing due diligence on Madoff feeder funds. The complaint identified numerous red flags that he analyzed with the support of extensive documentation, including performance statistics for three Madoff feeder funds and the MARHedge article. (Report pp. 77-79).

57.     Specifically, the hedge fund manager pointed out the following red flags: (a) while Madoff purported to trade $8-10 billion in options, there was insufficient volume in the market to support a trading level even close to that amount;[7] (b) Madoff was waiving the

---

[7] The hedge fund manager and Markopoulos both explained in their submissions to the SEC that even if there were enough options contracts to handle Madoff's claimed trading volume, the volume of his trades would have noticeably moved the market price for the options, which was not happening. As the Hedge fund manager stated, "[w]ith an 8-10 billion size, you must see the volume, but unfortunately you don't." (Report p. 79).

significant management and performance fees typically charged by asset managers; (c) Madoff's purported returns were not duplicable by anyone else using his purported strategy; (d) that there was no correlation to the overall trend in the equity markets; (e) Madoff always knew just the right time to convert his accounts to cash; and (f) the outside auditor of the firm was Madoff's brother-in-law. (Report pp. 77-80).

58.     At that time in 2003, the SEC staffers assigned to reviewing the complaint acknowledged that the complaint indicated that Madoff could be lying about his activities, and that the red flags were indeed "indicia of a Ponzi scheme." (Report p. 29).

### 2. The SEC's Negligent Handling of its Investigation

59.     Notwithstanding the obvious implications of the hedge fund manager's complaint, the Washington office completely failed in its efforts to investigate. First, the Investment Management team immediately referred the complaint to the Broker-Dealer team, despite the fact that the latter had no experience with Ponzi schemes or investment-management issues. (Report pp. 82-84).

60.     The Broker-Dealer team never conferred with the Investment Management team for support or information concerning the hedge fund manager's complaint. OIG later determined that this was largely due to a pervasive atmosphere of jealousy and secrecy that prevented SEC teams from working together effectively. (Report pp. 91-92).

61.     This lack of communication with the experienced Investment Management team was a significant problem because as the OIG found: "It does not appear that the Branch Chief and examiners were chosen to work on the Madoff examination due to any particular expertise or experience. At the time of the Madoff examination, OIG "didn't have many experienced people

at all ... we were expanding rapidly and had a lot of inexperienced people at the time I guess you could say we were all effectively inexperienced, [one staffer testified]." (Report p. 90)

62.     Another staffer stated that "there was no training," that "this was a trial by fire kind of job" and there were a lot of examiners who "weren't familiar with securities laws." The team was composed entirely of attorneys, who according to one member, did "not have much experience in equity and options trading" but "rather, their experience was in general litigation." Madoff later stated that one of the staff members "did not know what she was talking about, and that it was obvious she was not familiar with the industry." (Report p. 93, n. 62). The second-most senior staffer on the team later told OIG that he "didn't know anything, very little anyway, about hedge funds and mutual funds and how they operated." (Report p. 95).

63.     The inexperienced Broker-Dealer team did not begin its examination until December 2003, seven months after receipt of the hedge fund manager's complaint. During that time, millions of dollars continued to be stolen. The Broker-Dealer team could not explain to OIG why it waited so long. (Report p. 89).

64.     When the Broker-Dealer team did begin its investigation, it did so on entirely the wrong foot. The supervising staffers generally did not understand the complaint, and did not understand how it should investigate whether Madoff was running a Ponzi scheme or any of the many red flags that pointed in that direction. Instead, those supervisors chose to focus the investigation on front-running, which is the illegal practice of a broker executing orders on a security for its own account while taking advantage of advance knowledge of pending orders from its customers. For example, a broker will preemptively buy stocks for which it has a large buy order from a customer, knowing that the customer's order will drive up the price, allowing the broker to then sell its own stock at an immediate profit.

65.    In explaining the choice to focus the Broker-Dealer team on front-running, the supervisor stated that he did so "because that was the area of expertise for my crew." In other words, the team had only hammers, so it would look for only nails. The OIG's investigative team later "opined that the decision to focus an exam based on the expertise of a team rather than on the complaint itself is nonsensical." (Report p. 94, n. 63).

66.    The Broker-Dealer team's Planning Memorandum shows that the real issues of a potential Ponzi scheme and the numerous red flags in the complaint were ignored by the team. The Planning Memorandum omitted planning for numerous pertinent issues including: (a) Madoff's unusual fee structure; (b) the lack of sufficient options volume in the marketplace to support Madoff's claimed trading activity; (c) Madoff's inexplicable returns; (d) that Madoff's trading strategy was not duplicable; (e) the disconnect between his returns and the market trends; (f) the extraordinarily well-timed cashing-out of accounts at the end of selected quarters; and (g) the family relationship between Madoff and his auditor. A staffer later testified that, while these areas were "something we would look at," he could not explain why they were not included in the team's review. (Report p. 96).

67.    The staff did include one avenue of investigation in the Planning Memorandum that was directly on-point with the complaint, but failed to execute that plan. Specifically, the team wrote that it planned to write a letter to the NASD[8] to confirm Madoff's trading activity. And the team did, in fact, draft the letter. But the team never sent it. Had the team followed

---

[8] NASD, or National Association of Securities Dealers, Inc., was the predecessor to the Financial Industry Regulatory Authority ("FINRA"), which regulates the activities of member firms in the financial-services industry, including BMIS prior to its collapse.

23

through and sent the letter, it should have exposed Madoff's lack of trading activity and brought down the scheme.

68. During the course of the investigation, the Broker-Dealer team determined that Madoff was constantly lying to them. He lied about managing hedge funds. He lied about his overseas accounts. He lied about the reasons that his customer statements were so vague about trading details. He even lied about not having email, despite the SEC's knowledge that Madoff was claiming to run a highly sophisticated operation using "cutting edge technology." (Report p. 113).

69. Repeatedly, junior SEC staffers complained to their supervisors that Madoff was totally dishonest, yet the team kept going back to him for more information, and continued to accept oral representations from him about his activities, and continued to accept those oral representations without seeking any third-party corroboration. As the OIG later concluded, this was in violation of standard SEC policies and practices, because "[r]elying solely on verbal answers from the subject of a cause examination is not an appropriate method of investigation." (Report p. 206, n. 143).

70. For example, even though the hedge fund manager's complaint identified Madoff's relationship with his auditor as a red flag, the team never pursued that avenue of investigation at all. A staffer later testified that the auditor issue was "noteworthy and something that should have been followed up on." (Report p. 95).

71. Internal emails from a 2005 SEC investigation of a fund that invested with Madoff provided a step-by-step analysis showing that Madoff had to be lying about his options trading, which was the core of his alleged strategy. Like the complaints by Markopolos and the hedge fund manager, and as questioned by the Barron's and MARHedge articles, the emails

showed that the market had insufficient volume to support Madoff's claimed options transactions, especially because they would all have had to happen at the close of trading in order to match up with Madoff's reported execution prices. Further, the email explained that because the options trades were always profitable for Madoff, there was no incentive for a counterparty[9] to take the other side of those trades, which would be guaranteed to generate losses for them. (Report pp. 148-149).

72. Likewise, the team failed to consult the Chicago Board Options Exchange ("CBOE"), despite the fact that the hedge fund manager's complaint questioned whether any of the options trades Madoff was purportedly making through that exchange, which were central to Madoff's claimed trading strategy, had actually taken place. (Report p. 96). This consultation would have led to startling revelations that would have led the investigation in a more focused and streamlined manner.

73. Indeed, the Broker-Dealer team never requested a single bit of information or scrap of paper from any third party, or any of Madoff's counter-parties, a basic and fundamental procedure, notwithstanding the conclusive evidence of fraud any one of those third parties could have provided.

74. Even when the team could have pinned Madoff down by requesting critical documents directly from him, they failed even to carry out their own plans to do so. Specifically,

---

[9] In the financial-services sector, counterparties are the brokers, investment banks, and other securities dealers that serve as the contracting party when completing "over the counter" securities transactions (which are not made through securities exchanges, but rather directly between the parties or through non-exchange intermediaries). In Madoff's case, the counterparties would have been the entities he was trading options with, if he had actually been making any trades.

the team drafted a document request to Madoff seeking detailed audit trail data,[10] including the

date, time, and execution price for all of his trades in 2003. This request was critical because,

unlike his fake computer-generated customer statements, the audit trail data would have been

nearly impossible for Madoff to fabricate.

75.     But the team removed the request for this critical audit trail data from their

request, later stating that the data would have been "tremendously voluminous and difficult to

deal with" and would have "take[n] a ton of time" to review -- again disregarding a simple

common sense procedure just to avoid doing the required footwork, i.e., its job. (Report p. 98)

The team's supervisor later admitted to the OIG that it "would have been, frankly, asinine for us

not to get the audit trail." (Report p. 109).

### 3. Closing of the Investigation

76.     In early April 2004, having resolved none of the concerns raised by the hedge

fund manager's complaint, the team was suddenly told to shelve the effort. The investigation

was never formally concluded, and no final report or memorandum was produced, which the

OIG determined was a "critical error" and a serious failure to follow appropriate protocols.

(Report p. 144).

77.     The OIG later stated that "significant questions or concerns raised during a cause

examination should not be left unresolved due to the urgency associated with such cause

examinations" (Report p. 13), and that had this investigation "been staffed and conducted

appropriately and basic steps taken to obtain third-party verifications, Madoff's Ponzi scheme

should and would have been uncovered." (Report p. 29).

---

[10] Audit-trail data is the information that documents and details every step of a securities
transaction from order through execution.

78.     Unfortunately, the seemingly knowledgeable and presumably more skilled Investment Management team decided not to follow up themselves. Instead, like the Investment Management team in Washington, the New York team referred the issue to their office's Broker-Dealer team. As in the earlier investigation, the Broker-Dealer team never consulted with the Investment Management team for guidance, insight or advice. And like the Broker-Dealer team in Washington, the New York team waited seven months after the case was first referred to it, until December 2004, before a team was even assembled. (Report pp. 162-165).

79.     The New York team did reach out to one third party, and had the team followed through on its effort, it would have discovered the Ponzi scheme. One of the staffers sent a letter to a large and reputable foreign financial institution Madoff claimed to be using to clear his trades. The financial institution replied that there was no trading activity in Madoff's account. That reply should have set off alarm bells. But, instead of following up with other third parties to see if anyone was clearing trades for Madoff, the staffer simply concluded that Madoff must have been clearing his trades somewhere else, without even asking that question of any other clearing firm.

80.     When the team demanded documents and information directly from Madoff, he gave them an unwelcome surprise. Madoff stated that he had already provided the information to the Broker-Dealer team from the Washington office. This was news to the New York team, which never knew about the existence of the Washington investigation, and were dumbfounded and embarrassed in the presence of the target of their investigation.

81.     The New York team's ignorance of the Washington team's activities is not surprising given two facts. First, the Washington team had never entered the opening of their case in the SEC's internal case tracking system, which violated standard SEC policy. Second,

27

even if the Washington team had followed that policy, the New York team never checked the system before launching its own investigation, another violation of standard SEC policy. As the OIG later concluded, "there should never be two examinations of the same entity being conducted at the same time without both teams being aware of each other's examination." (Report pp. 131-133).

82.     After Madoff alerted the New York team to the existence of the Washington investigation, there were a few cursory phone calls exchanged, but "relatively little sharing of information." The Washington team declined to reopen their dormant investigation, and instead passed their work papers to the New York team, which in turn disregarded them. (Report p. 34).

83.     The New York team never familiarized itself with the hedge fund manager's complaint, never discussed the Washington team's collection of unanswered questions, and never even compared the list of clients Markopolos had given the Washington team with the one he had given them, which would have revealed glaring inconsistencies that could not have been explained by anything other than fraud. Instead, the responsible staff member stated that he "may have glanced at" the hedge fund manager's complaint, and that: "I had conducted some sort of like cursory review of the documents, but it seemed so similar to what we were receiving in real time, that I didn't spend a lot of focus and I just - - this didn't stick out to me at the time." (Report p. 200).

84.     Indeed, this latest round of the SEC's passing the buck from team to team served only to help cut short the New York investigation. While junior staffers pushed to follow leads and pursue Madoff's deceptions, their supervisors determined that because the Washington office had looked into similar issues, they must have been properly resolved when in fact the Washington investigation had never concluded and left a mountain of unanswered questions. The

supervisors claimed that those issues had already been resolved by Washington and could be disregarded. When the junior staffers persisted, the supervisors admonished them that the SEC could not be wasting resources on a "hunch." (Report p. 223).

### 4. The SEC's Negligent Handling of its Next Investigation

85.     After the Markopolos report was referred by the Boston office to the New York office, it was assigned to an Enforcement team, which should have resulted in a more capable inquiry than the earlier Broker-Dealer examination teams in Washington and New York. But the team that was assembled, like the Broker-Dealer teams, had no useful experience in conducting Ponzi scheme investigations. Indeed, the lion's share of the work was assigned to a junior staff attorney who had only recently graduated from law school and joined the SEC nineteen months before the referral.  She had no working knowledge at all of broker-dealer issues, or any other financial-regulatory matter; a deficiency that, combined with the unprofessional attitude of her supervisor, would repeatedly sabotage the team's investigation. (Report pp. 242-244).

86.     When the Enforcement team was given the assignment, Markopolos himself contacted the supervising staff member to ensure that the information in his report was clear and was understood by the team. Ironically, in doing so, he inadvertently triggered a vendetta against himself by the supervisor, who would thereafter constantly denigrate him and the importance of the investigation. (Report pp. 247-251).

87.     Specifically, Markopolos asked the supervisor if she had any experience with investigations into derivatives trading.[11]  The supervisor replied that she did, referring to her

---

[11] A derivative is a financial instrument that is derived from the future value of some other asset, index, event, value or condition. An option is a kind of derivative.

experience with the Adelphia scandal.[12] Markopolos was surprised because the Adelphia case did not involve derivatives at all: rather, it was an accounting-fraud case. When he explained this to the supervisor, she brusquely terminated the conversation, presumably embarrassed at having been exposed as not knowing about derivatives transactions. This lack of knowledge seriously handicapped any investigation of whether Madoff's complex options-trading strategy was cloaking a Ponzi scheme. (Report p. 251, n. 174).

88.     The supervisor thereafter refused to acknowledge Markopolos' expertise or the importance of his report and its conclusions. Instead, she manufactured reasons why the team should not take him seriously, such as that Markopolos was not a Madoff insider or client; a fact which had no bearing on the evidence laid out in his submission. Indeed, the supervisor even suggested that Markopolos was not credible because he was probably a "bounty hunter," despite the fact that Markopolos' own report demonstrated that, if he was right in his suspicions, he would not be eligible for any bounty. (Report p. 275. n. 192).

89.     The supervisor persisted in these characterizations even after staffers in the Boston office called her to vouch specifically for Markopolos' credibility. (Report p. 275. n. 193). She failed also to contact the industry professionals Madoff had referred to her to back up his report. And when Markopolos followed up, offering the supervisor a large stack of materials to further support his claims and to aid in the investigation, she admittedly disregarded the additional submission completely. (Report p. 275). The supervisor was angry, embarrassed, and

---

[12] Adelphia Communications Corp. was a cable-television company that imploded when it was discovered that the company's founders had manipulated a complex cash-management system and a network of shell companies to cloak their theft of $100 million in company funds. No financial products other than Adelphia stock were involved in the scandal.

unwilling to acknowledge her own lack of expertise, and she ended up taking out her personal frustrations on Markopolos and, in turn, on Madoff's victims.

90.     The Enforcement team's investigation was further undermined by its contact with the New York Broker-Dealer team, which falsely stated that it had already investigated the Ponzi-scheme angle, saying that "these are basically the same issues we investigated" and that Markopolos didn't "have the detailed understanding of Madoff's operations that we do which refutes most of his allegations." (Report p. 276).

91.     Later, the Broker-Dealer team admitted to OIG that none of this was true, and that it had only examined the front running issue. Due in part to this negligent mischaracterization of the Broker-Dealer team's work, the Enforcement team proceeded as if merely retreading old ground.

92.     When it did begin its investigation, the Enforcement team waited two months, until December 2005, to open a matter under inquiry ("MUI"), a required step at the beginning of any Enforcement investigation. In the MUI, the team termed its inquiry a "fraud investigation" (Report pp. 262- 236), and in the subsequent Case Opening Report filed by the team on January 24, 2006, the team stated that it was "trying to ascertain whether the complainant's allegation that BLM[S] is operating a Ponzi scheme has any factual basis."

93.     Prior to its delayed opening of the MUI, the Enforcement staff was not automatically informed of other relevant information that the SEC received about Madoff. (Report pp. 262-265). In this instance, the delay was highly material, because the SEC had received yet another complaint about Madoff in October 2005, from an anonymous informant stating, "I know that Madoff [sic] company is very secretive about their operations and they refuse to disclose anything. If my suspicions are true, then they are running a highly

31

sophisticated scheme on a massive scale. And they have been doing it for a long time." The informant also stated: "After a short period of time, I decided to withdraw all my money (over $5 million)." Because of the failure to open the MUI, the Enforcement staff was ignorant of this complaint for the duration of its investigation. (Report p. 284).

94.     Hobbled by inexperience, misplaced personal feelings, a lack of fundamental securities, financial, and investigative knowledge, incompetence, and laziness, the Enforcement staff focused its investigation in all the wrong places. Just as the earlier investigations had focused on front-running instead of the Ponzi-scheme scenario, the Enforcement team focused almost exclusively on determining whether Madoff should register as an investment adviser or whether Madoff's hedge fund investors' disclosures were adequate. This focus clearly ignored the initial designation in the MUI of a "fraud investigation." Moreover, the OIG determined that the Enforcement team's plan "primarily involved comparing documents and information that Madoff had provided to the [Broker-Dealer team during its prior investigation] (which he fabricated) with documents that Madoff had sent his investors (which he also fabricated)." (Report p. 269).

95.     Nevertheless, even with all the handicaps the investigation was suffering under, the Enforcement team still caught Madoff in a pattern of relentless lies, reminiscent of the earlier experience of the Broker-Dealer teams. For example, documents the Enforcement team obtained from a Madoff feeder fund demonstrated that Madoff had previously lied to the Broker Dealer team about having stopped using options as part of his strategy. Indeed, when the team interviewed one of the feeder fund's executives, they discovered that his statements on the issue were scripted by Madoff himself. (Report p. 37). Yet, the Enforcement team never followed up on this obvious deception about the very nature of Madoff's entire "proprietary" trading strategy,

or the fact that he was manipulating and controlling the fund managers who were steering clients to him to the extent that they would parrot his lies to the country's top securities-law enforcement agency.

96.    In February 2006, the Enforcement staff, which had no idea how to investigate Madoff's purported trading strategy, and had been spinning its wheels for months, finally reached out for assistance by contacting the SEC's Office of Economic Analysis ("OEA"). But OEA failed to respond to the request in any way. In April 2006, the Enforcement staff returned to OEA, but this time, it failed to provide OEA with a copy of Markopolos' 2005 complaint. (Report pp. 295-301).

97.    One OEA staffer, who was an expert in options trading, later reviewed some other materials describing Madoff's strategy and concluded after 20 minutes, that Madoff's "split-strike conversion" strategy "was not a strategy that would be expected to earn significant returns in excess of the market." The OEA staffer later stated that, if he had known the massive amount of assets Madoff claimed to have under management, he would have also mathematically ruled out front-running. Incredibly, though, this expert, who had the evidence of Madoff's fraud in his hand and understood it, unlike the Broker-Dealer team, never communicated his conclusions to the Enforcement team. The Enforcement team never followed up. (Report p. 299).

98.    The Enforcement team never contacted any of the other SEC offices with relevant experience, despite the fact that it had no comprehension of the most basic concepts required to carry out their investigation. For example, the team was not aware of how trading activity could be confirmed, how custody of assets could be determined, and how trading volume observed in the market could indicate whether or not the massive movement represented by Madoff's alleged activities was actually occurring.

99.     Specifically, the team never contacted the SEC's Division of Trading and Markets, which could have explained how trading could be confirmed through DTC or NASD. Nor did it contact the SEC's Office of International Affairs ("OIA") to gain an understanding of Madoff's alleged trades with foreign counterparties, a tool he utilized to fool the investigators into thinking he was actually doing business. (Report pp. 306, 335).  In part, this was because the team's supervisor did not think much of OIA, stating in a contemporaneous email: "I hate OIA - - they are probably the slowest part of our bureaucracy, and that is saying a lot." (Report p. 335).

100.     In May 2006, notwithstanding this complete lack of substantive competence, and despite an explicit warning from a senior NASD officer that it was not properly equipped to do so,[13] the Enforcement team went ahead with a sworn examination of Madoff.

101.     Madoff appeared for the examination on May 19, 2006 without counsel, continuing a pattern he had established throughout the SEC's inquiries of handling all interactions with the SEC personally. (Report p. 310).  This should have set off alarm bells for the staff, given the fact that it is unheard of for a major financial firm like Madoff's to conduct any, let alone all, of its contact with a regulatory agency through anyone but attorneys or compliance officers, let alone the firm's chief executive officer. Instead of viewing Madoff's solo appearance as evidence of illegal activity, the staff simply thought that it "seemed funny."  More importantly for them, they viewed it as burdensome because Madoff was more difficult to deal with than an attorney would have been. In other words, the team's concern with small matters of

---

[13] The NASD officer later testified that the Enforcement team had asked him "extremely basic questions" about options trading that indicated the team's total lack of capacity to investigate Madoff. Referring to a conversation he had with another NASD officer, "we were both, sort of, shaking our heads, saying that, you know, it really seemed like some of these (options trading] strategies were over their heads." (Report p. 310).

convenience again obscured its view of the "big picture" warning sign presented by Madoff's appearance without counsel. As one witness would later explain to the OIG, the SEC staffers consistently "missed the forest for the trees." (Report p. 423).

102.    During the examination, Madoff "provided evasive answers to important questions, provided some answers that contradicted his previous representations, and provided some information that could have been used to discover that he was operating a Ponzi scheme." (Report p. 310). For example, when asked the critical question of how he was able to achieve his consistently high returns, Madoff employed the philosophy that the best defense is a good offense. He disregarded the substance of the question, and instead attacked the author of the Barron's article. He then repeatedly distracted the neophyte team from the nuts and bolts of his purported trading strategy by attributing his success to his "gut feel" for the market. A more experienced team of staffers, or even marginally more knowledgeable lay persons, would have known that three decades of unbroken double-digit returns cannot be achieved through supernatural instincts. The Enforcement team, however, accepted Madoff's explanation at face value. (Report pp. 310-320).

103.    Notwithstanding its wholesale mishandling of the examination, however, the team again came close to uncovering Madoff's fraud as a result of his sworn testimony, but again failed to follow-up. Madoff testified that the trades for all of his advisory accounts were cleared through his account at DTC, and the account was segregated at DTC from his brokerage accounts. Given his prior experience with SEC investigations, Madoff was surprised when the staffer asked for the DTC account number. Boxed in, Madoff reluctantly complied. (Report pp. 323-334).

104.   Madoff later told OIG that, at the time, he thought that his scheme was about to be exposed: "I thought it was the end game, over. Monday morning they'll call DTC and this will be over." (Report p. 312). A single call to DTC would have revealed that regardless of whether his DTC accounts were segregated, he was not holding the billions of dollars in stock positions he claimed to have.

105.   Subsequently, the junior staffer on the Enforcement team actually did contact DTC. She asked whether Madoff had two segregated accounts as he had testified. DTC confirmed that there was only a single, unsegregated account, but the staffer "ascribed no significance" to Madoff's lie. (Report p. 330). Remarkably, the staffer never asked the next obvious and critical question, which could have ended decades of fraud: "How much is in the account?" If she had, she would have discovered a much more troubling lie: while Madoff had represented that the account contained at least $2.5 billion in S&P equities, it actually contained less than $18 million of those equities. As Madoff himself expected, that information would have brought down his house of cards. Instead, as he said, "it never happened." He "was astonished." (Report p. 312).

106.   Furthermore, even with the limited information she had obtained from DTC, the junior staffer had all the evidence she needed to pursue Madoff for commingling the funds of his advisory and market-making businesses; DTC had explicitly told her that Madoff did not maintain segregated accounts. But the staffer apparently was too inexperienced to understand that she had already caught Madoff in serious wrongdoing, and simply disregarded the commingling, which, if pursued, would itself have inevitably brought down the scheme. (Report p. 332).

107.    The Enforcement team also missed other opportunities to stop Madoff by obtaining basic information from third parties and then utterly failing to follow up obvious and necessary areas of further inquiry. For example, the team contacted the NASD to ask about Madoff's claim to have held certain option positions on a particular date. The NASD replied that in fact Madoff had no option positions on that date. Not understanding the monumental significance of this fact, the Enforcement team did not follow up, despite the fact that Madoff's entire trading strategy allegedly hinged on the actual existence of those positions. (Report pp. 306-309). No competent securities regulator could fail to recognize that a purported options trader who does not in fact trade options is a fraud.

108.    Similarly, although the junior staffer attempted to obtain documentation from Madoff's purported counterparties, and one of them was in the process of drafting a consent letter asking Madoff's permission to send the Enforcement team documents that would have exposed the scheme, the staffer's supervisor instructed her to rescind the request, a decision the OIG would later describe as "inexplicable." (Report pp. 370-371).

109.    The junior staffer later acknowledged that the team had not confirmed Madoff's purported trading activity.

110.    The cumulative effect of the junior staffer's inexperience and incompetence, and her supervisors' hostility towards Markopolos, was that the 2005 Enforcement team's investigation resulted in no meaningful action against Madoff. Having established that Madoff lied about the number of investment-advisory clients he had, the team merely procured his agreement to register as an investment adviser, despite the fact that the team's own case-opening report indicated that the purpose of the investigation was to determine whether Madoff was a fraud.

37

111.    Apart from the registration, no action was taken, not even a rudimentary follow-up with respect to the services Madoff was supposedly performing for the investment-advisory clients he had lied about not having.  Had such a follow-up been conducted, the team would have discovered the absence of trading through that alternate route, and exposed the fraud.

112.    By June 2007, the investigation was "for all intents and purposes closed without the formalities," without any resolution regarding the dozens of red flags raised by Markopolos. Incredibly, notwithstanding Madoff's lies and the multitude of open questions, the team's Case Closing Recommendation (which was not issued until January 2008) stated that the team had discovered "no evidence of fraud."

### G. December 2006 - Taking Madoff At His (Lawyer's) Word

113.    In December 2006, three months after dismissing Markopolos for the third time, the SEC received yet another complaint.  Unfortunately, it landed in the lap of the same Enforcement staff in the New York office that had just disregarded Markopolos.

114.    The Enforcement team had received an anonymous complaint stating that Madoff was commingling customer funds with his own: "Your attention is directed to a scandal of major proportion which was executed by the investment firm Bernard L. Madoff.... Assets well in excess of $10 Billion owned by the late [investor], an ultra-wealthy long time client of the Madoff firm, have been "comingled" with funds controlled by the Madoff company with gains thereon retained by Madoff." (Report p. 358).

115.    In this case the Enforcement team's "investigation" consisted solely of a telephone call to Madoff's lawyer. The lawyer told the team that Madoff had informed him that the investor was not a Madoff client. The team believed him, later stating that the information was accurate

because it was transmitted through a respected attorney. The inquiry ended. It later came out that the purported client was in fact one of Madoff's single largest investors. (Report pp. 358-359).

### H. June 2007 - Markopolos' Final Warning

116.    In June 2007, Markopolos made one last attempt to rouse the SEC to the danger of Madoff's scheme. He sent an email to the supervisor of the New York Enforcement team attaching "some very troubling documents that show the Madoff fraud scheme is getting even more brazen" and noting ominously; "[w]hen Madoff finally does blow up, it's going to be spectacular, and lead to massive selling by hedge funds as they face investor redemptions." His email was ignored by the supervisor, who would later second her subordinate's characterization of the 2005 investigation as a "fishing expedition" while stating that she had "no interest in another Madoff." (Report pp. 354-355).

### I. March 2008 - A Note to the Chairman

117.    In March 2008, the SEC received one final warning, from the same person who had written in December 2006 about Madoff commingling an investor's money with his own. This time the warning was made in an email sent to the Chairman of the SEC. The informant re-sent the earlier complaint, and further stated: "It may be of interest to you to that Mr. Bernard Madoff keeps two (2) sets of records. The most interesting of which is on his computer which is always on his person." (Report p. 358).

118.    The new complaint was forwarded, in by-now-familiar fashion, to the very same New York Enforcement team that had just turned a blind eye to Madoff's lies, and which immediately sent it back to the Chairman's office, stating: "[W]e will not be pursuing the allegations in it." Nothing more was done. (Report p. 359)

### J.  December 2008 - The House of Cards Collapses

119.    The near-meltdown of the world economy in mid-2008 had a profound impact on

Madoff's "business."  Existing investors in need of cash, or skeptical of keeping their money in

the market, were asking for redemptions at an accelerated rate.  New investors were few and far

between and Madoff was becoming desperate, scouring the globe for prospects, his vaunted

exclusivity being eroded as more and more fund managers became aware that the "rare"

invitations being extended to them were being offered to their competitors at the same time.

Every day his reserves were depleted ever closer to the point where he would have to deny

redemption requests.

120.    Madoff finally hit rock bottom and lost all hope of propping up the scheme any

longer in early December 2008.  At that time, he realized that his accounts were practically

empty, while being faced with billions in redemption requests.  On December 10, 2008, he

huddled with his sons, who ran his brokerage operation, and purportedly admitted to the heinous

crimes he had been committing for decades.  The next day, he revealed to the world that his

multi-billion-dollar investment empire was a complete fabrication, a sham, and a fraud - - "one

big lie," in his words.

121.    In the following weeks and months, Madoff's victims learned that Madoff should

have been stopped years earlier.  In fact, he would have been stopped had their own government

simply done its job and had the agency charged with safeguarding them not closed its eyes to

Madoff's crimes.  They discovered to their shock and dismay that the SEC had been repeatedly

warned of Madoff's fraud, and had access to all the information it needed to unveil the fraud.

They learned that the SEC allowed Madoff to continue his fraudulent scheme without discovery

through the agency's sheer incompetence, indifference, and laziness.  Already victimized by a

40

brazen con artist, they found themselves doubly betrayed, this time by the law enforcement agency charged with protecting them.

122.    The OIG concluded the Executive Summary of the Report in this way: "[D]espite numerous credible and detailed complaints, the SEC never properly examined or investigated Madoff's trading and never took the necessary, but basic, steps to determine if Madoff was operating a Ponzi scheme. Had these efforts been made with appropriate follow-up at any time beginning in June of 1992 until December 2008, the SEC could have uncovered the Ponzi scheme well before Madoff confessed." (Report p. 41).

123.    The Report states that the SEC "could" have discovered the Ponzi scheme, had it not failed in all the ways detailed by the OIG. This lawsuit contends that, had the SEC performed its everyday, non-discretionary functions with the most basic level of competence, it would have uncovered the scheme, and that thousands of innocent investors would have been spared the financial and emotional nightmare they are now living.

124.    Simple competence and diligence would have prevented Plaintiffs' losses. This is evidenced by the above recounting of instances in which the SEC failed to perform its duties with reasonable due care. In some cases, a single action, performed diligently and ably, or even with the most minimal competence, would have exposed the scheme. In other cases, the effect is cumulative, with it being obvious that Madoff would have been caught if not for the pattern of incompetence that sabotaged all of the SEC's investigations. As it was, the SEC caused Madoff to pass through investigation after investigation untouched, leaving his reputation among investors not only intact, but enhanced by the implied seal of approval lent to him by the SEC's failure to act.

125.    Plaintiffs relied on the SEC to protect them and, instead time after time, the SEC's agents looked the other way, allowing an obvious danger to grow exponentially, until massive injuries to the Plaintiffs and other Madoff investors became inevitable.  The SEC disregarded its own internal rules and procedures and committed gross negligence through a conscious decision to allow agency staff to perform their duties with rank incompetence, and with total disregard for foreseeable harm that the SEC was specifically and repeatedly warned would result from its inaction.

## CLAIM FOR RELIEF

### (Negligence—Violation of the FTCA)

126.   Plaintiffs repeat and reallege paragraphs 1 through 125 above, as if set forth fully herein.

127.   Federal agencies owe a duty of reasonable due care to all members of the general public who are foreseeably endangered by its conduct.

128.   The SEC specifically owes a duty of reasonable due care to all members of the general public including all investors in U.S. financial markets who are foreseeably endangered by its conduct.

129.   The SEC staff members responsible for examining and investigating Madoff's activities committed the various non-discretionary acts and omissions described above, which caused the perpetuation and expansion of Madoff's Ponzi scheme, and which created a foreseeable risk to those who invested money with Madoff.

130.   By committing the various acts and omissions described above, the SEC breached the duty of reasonable due care it owed to Plaintiffs as members of the general and investing public who could foreseeably be injured by the perpetuation and expansion of Madoff's Ponzi scheme.

131.   The SEC's negligence was a substantial factor in causing Plaintiff's injuries, and those injuries were the natural, probable, and foreseeable consequence of the SEC's negligence.

132.   The foregoing breaches of duty of reasonable care by SEC staff members constituted negligence in the performance of ordinary tasks required by SEC policy and practice, and were not committed in connection with the performance of any discretionary functions.

133.    Some or all of the aforementioned breaches of duty of reasonable care were committed with wanton and reckless disregard for public safety and thus constituted gross negligence.

134.    As a result of the foregoing breaches, each of the Plaintiffs have been damaged in an amount to be determined at trial, but not less than $500,000, each.

WHEREFORE, Plaintiffs respectfully request judgment in their favor against the Defendants, jointly and severally, as follows:

(a)     Awarding ALLAN H. APPLESTEIN, as Trustee for the Benefit of D.C.A. GRANTOR TRUST, compensatory damages in an amount to be determined at trial, but not less than $500,000;

(b)     Awarding GEORGE R. MARKS compensatory damages in an amount to be determined at trial, but not less than $500,000;

(c)     Awarding GEORGE R. MARKS, as Beneficiary and for the Benefit of GEORGE R. MARKS I.R.A., compensatory damages in an amount to be determined at trial, but not less than $500,000;

(d)     Awarding HAROLD SCHWARTZ, as Trustee for the Benefit of HAROLD SCHWARTZ 1997 IRREVOCABLE TRUST, compensatory damages in an amount to be determined at trial, but not less than $500,000;

(e)     Awarding HAROLD SCHWARTZ, as Trustee for the Benefit of HAROLD SCHWARTZ 1998 LIVING TRUST, compensatory damages in an amount to be determined at trial, but not less than $500,000;

(f)     Awarding as HAROLD SCHWARTZ, as Beneficiary and for the Benefit of HAROLD SCHWARTZ I.R.A., compensatory damages in an amount to be determined at trial, but not less than $500,000;

(g)     Awarding ROSENMAN FAMILY, LLC compensatory damages in an amount to be determined at trial, but not less than $500,000;

(h)     Awarding ROBERT I. LAPPIN, Trustee for the Benefit of SHETLAND PROPERTIES EMPLOYEE SAVINGS & RETIREMENT PLAN, compensatory damages in an amount to be determined at trial, but not less than $500,000;

(i)      Awarding DANIEL SILNA, as Trustee for Benefit of O.D.D. INVESTMENTS L.P.

PROFIT SHARING PLAN, compensatory damages in an amount to be determined at

trial, but not less than $500,000;

(j)      Awarding plaintiffs' attorneys' fees, costs, and disbursements to the extent permitted

otherwise by law; and

(k)      Awarding plaintiffs such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: New York, New York
       January 25, 2011

Howard Kleinhendler
Julian D. Schreibman
Sara Spiegelman
WACHTEL & MASYR, LLP
1 Dag Hammarskjold Plaza
885 Second Avenue
New York, New York 10017
(212) 909-9500

*Attorneys for Plaintiffs*